I'll call him Deputy Vadziminick and I represent him in his individual capacity. The district court erred in denying Deputy Vadziminick's motion for summary judgment based on qualified immunity. Thus, he's asking this Court to reverse that decision because, one, his conduct during the incident in question was objectively reasonable under the totality of the circumstances that he was faced with, and, two, his conduct was objectively reasonable in light of clearly established law as of January 29th, 2014. As you all ---- was there that any kind of a crime, much less a significant or serious crime, was about to take place? Was there? As far as a serious crime? Any kind of crime. Well, he was obviously violating Penal Code 42.03 for disorderly conduct, also 42.01. What was he doing that was ---- would be considered disorderly conduct? On January 29th, 2014, a resident in the Park Lake Subdivision called in because there was a man, a nearly-naked man, outside yelling for help, creating a disturbance. But the report was that there's a man here needing help, right? Not that there's a man who's about to break in somewhere or hurt somebody. That is correct, Your Honor. Not that he was about to break in. He was outside yelling at the top of his lungs in the middle of the night, between 3 and 4 a.m., causing a disturbance. And he was frightening the residents, woke them up. Did the officer suspect he was on drugs? Yes, both officers did. Deputy McGregor was the first responder to the call, and Deputy Vadzimniks arrived shortly after Deputy McGregor. But ---- He's the one who tased him. Your client arrived second. Yes, Your Honor. Deputy Vadzimniks is the one that used the taser. However, when Deputy McGregor arrived on scene, he was led to where Mr. Samples was standing in the middle of the roadway, of course, in his underwear and freezing and shivering. Deputy McGregor got out of his patrol vehicle and immediately started to try to negotiate with Mr. Samples, asking him, why are you outside with no clothes on? He was speaking incoherently, and Deputy McGregor immediately thought he was intoxicated on some form of substance. Deputy Vadzimniks had arrived just a couple of minutes after McGregor. Here's McGregor negotiating with Mr. Samples. He also hears Mr. Samples speaking incoherently, and he immediately thinks that this man is intoxicated on some form of substance as well. Deputy McGregor continued to try to negotiate with Samples because Samples kept walking away from him, and Samples was walking towards a retention pond that ended at the end of the street. This Park Lake subdivision, it's a large subdivision, and it has all of these lakes that are full of water, retention ponds, to wrap the neighborhood. And that's where Mr. Samples was headed. Deputy McGregor... Wait a minute. The retention pond was 600 feet away, right? Yes. Two football fields away. So how was there any indication that that's where he was headed? That is what Deputy McGregor's — that was in his statement, that he kept walking — when he walked away from him, he kept walking towards that retention pond. So that was Deputy McGregor's thoughts, that that's where he was going, to immerse himself in this retention pond. That's pretty speculative, two football fields away. It doesn't make sense to me. Your Honor. Was there anything between your client and the retention pond? A house or a car or... At one point, when Mr. Samples kept failing to obey Deputy McGregor's commands to stop walking away and get into the patrol vehicle, Deputy McGregor then drove his patrol vehicle in front of Samples to try to stop him from walking any further towards that retention pond. Mr. Samples walked around the patrol vehicle. Deputy McGregor gets back out and starts commanding him to stop, get in the patrol vehicle, stop, get in the patrol vehicle. This is when Deputy McGregor then goes to try to apprehend Mr. Samples to put him into the patrol vehicle. He grasped both of Mr. Samples' arms, and Deputy Vadzimnik is witnessing all of this. He's standing right over here. Were there dash cams? Behind Deputy McGregor. Were there any dash cams? No. No. Deputy McGregor failed to realize he had not turned on his dash cam, so there is a video. However, this is after Deputy McGregor handcuffs Mr. Samples after he's been tased. He runs back to the patrol vehicle and remembers to turn it on, so you see 30 seconds of what happened before, but you do not see the tasing. Was it tased from the front or the back? Um, when Deputy McGregor grasped him, Samples was turned the other way, broke free of Deputy McGregor's grasp, turned around and took the fighting stance, and that's when Deputy, that's exactly when Deputy Vadzimnik deployed his taser. How was he dressed at the time? In his underwear. So was he bare to the chest end and bare-legged? Yes, he was bare all over. It was apparent that he was not armed, and there was no gun to reach for. We hear that he might have had a gun. I thought he might have had a gun, so I shot him or I tased him, whatever. So he's looking at a man that's fully unclothed, standing in front of him, and he goes to the fighting stance, and then he, at that point, responds with a taser. Yes, Your Honor. How large a person was this, the man? Mr. Samples? Yes. He was, I believe, the plaintiff said he was, I think he's 5'3", around 100. 5'3", wow. Okay, and Deputy McGregor clearly outweighed him, and that's, Deputy Vadzimnik thought it was very odd that Mr. Samples exhibited this unusual strength that he could even break free of Deputy McGregor's grasp, and it was when he broke free of Deputy McGregor's grasp and turned around and took that fighting stance like he was going to attack them, is when Deputy Vadzimnik deployed his taser. How far apart were they when he took the fighting stance? Well, Deputy McGregor said that he pushed off from Samples at that point because he thought Samples was going to attack him, so I'm assuming they were very close, not too far away, and Deputy Vadzimnik was standing right behind Deputy McGregor. But to get back to your point of whether he was clearly unarmed, I would point you to the Carroll v. Ellington case. I don't need another case to tell me whether somebody's armed or unarmed. That's a factual question here. The man is standing there in his shorts and stripped down to that. He's 5'3". How big is this officer? He's about 200 pounds. Clearly outweighs him. And how tall was he, you know? I'm not sure how tall. More than 6 feet? He's about 6 feet. He's over 6 feet. He's coming to my office. Okay, so that's a 5'3 individual who's plainly upset. He's left his clothes elsewhere in the middle of the street. So he's apparently not, as my colleague was pointing out to you, plainly cannot be about any burglar or any other kind of thing. He's plainly deranged or out of his head. Right, and methamphetamines were found in his system. Whatever the reason, I just have trouble seeing that tasers are a threat of life and limb. I mean, it's not just a little tickle. He was tasered once, as I understand it. Took both palms, they didn't. But, Your Honor, the use of a taser to gain control of a suspect who's clearly resisting arrest, it has been held to be reasonable under several different cases. Pratt v. Harris County, Texas. Galvin v. City of San Antonio. And those were dealing with individuals— There's no taser exception to qualified immunity. In each of those factual patterns, there was a sufficient threat and risk of harm if the individual were not controlled. But where the individual presents no threat to anyone, even to himself at that point, the officer, rather than using physical force, a 6-foot officer to restrain this 5-foot-3 man, the easy way to do that is to zap him with that. Now, there's a risk in doing that, as happens here. Yes, Your Honor, there is a risk. Are there other cases, do you have another case that factually is like that? Factually like that? Well, I would go back to the Carroll v. Ellington case. Even though it was a 2015 case, and this happened in 2014, the law was not clearly established that using a taser and a stun gun to gain compliance of an unarmed, seated suspect for resisting arrest and failing to obey commands to get onto the ground was excessive force in violation of the Fourth Amendment. But as you know, the facts of Carroll were very different because the man had been seen out amidst a bunch of mailboxes outside a group of homes just suspiciously lording around smoking a cigarette. The officers thought he was maybe getting ready to break into a dwelling. He actually did enter that dwelling, and it turned out it was his own, but the officers had no way of knowing that. But there was every reasonable suspicion that there was some kind of a serious crime about to be committed, whether it was a burglary or robbery or vandalism or something else. And here you have none of those facts. Well, I would disagree, Your Honor, because it would be the perception of what those officers were faced with and whether they feared for their safety or even the threat of safety. They reasonably feared for their safety. Yes. Yes, Your Honor. And Deputy McGregor made it clear that he thought that Mr. Samples, he was clearly intoxicated. And for some reason, he keeps walking towards this retention box. What threat was he to him? Excuse me? What was the threat that he presented? The threat was when he broke free of Deputy McGregor's grasp, despite the fact that he... And what was he going to do? Well, when he took a fighting stance, they both thought Deputy Vadzimniks and Deputy McGregor thought he was about to attack them at that point. The officer thought that the man might actually try to hit him. You're right, but I don't want to judge it from 20-20 hindsight. I believe that the Supreme Court told us we can't do that. We have to look at what the officer feared. Well, you know, being a police officer, there's a lot of risk and dangers, and I'm very sympathetic with their plight. But using physical force is also how to take down an individual. Without this kind of thing, it's part of their basic training itself. I mean, do you have anything in the records show about how he's trained to do, to use this, or what his training is with regard to the use of that taser? Yes, Your Honor, there is. I included the Harris County Sheriff's Office policy on the use of tasers, and I believe the plaintiff even submitted that with its summary judgment brief. And when, at the point that a suspect is not obeying any lawful commands, and at the point when they believe that they're fearing for, or they fear for their safety, they're allowed to use their taser. That's kind of the level of generality. At the point at which he disobeys his command, if you look at those cases, it's what command is he disobeying? One of which is justifiably, show me your hands. Don't lower, get your hands up. And the man is clothed. There's a risk there, and a significant one, in many of these circumstances, that he has a weapon. He's got a gun in his pocket, or his waistband, whatever. None of that's here. So I don't see any possible risk to this officer, other than this man, he clearly outmanned, might cause him to scuffle of some sort. Did you have a case that deals with that circumstance? Well, in Carroll v. Ellington, the court may note that this man was seated, clearly not trying to flee, and was clearly unarmed. And the command that he failed to obey was to get off the chair and get onto the ground. And he was, and that officer used a taser, as well as a stun gun, to get him onto the ground. And at that point, it wasn't clearly established that using that taser or stun gun was excessive force. And what did the officer tell him to get down? Get down on the ground, I believe. To get out, get out? Get off of the chair and get down onto the ground. They were in the man's kitchen, supposedly. Was there a risk with Mr. Samples? What about here? I'm sorry. What about this situation? What did the officer, did he tell him to get out? No. Mr. Samples, Deputy McGregor constantly told him to stop. Stop walking away. And get into the patrol vehicle. And that's what he failed to obey. Those lawful commands. Was there a risk when he, Samples was coming toward the police officer with his fists raised, was there a risk that he might go for one of the guns? One of the officer's guns? Well, what both... Were they close enough that that could have happened? Deputy McGregor's statement to the Internal Affairs Division was that he tensed up, clenched both of his fists, and looked like he was going to attack Deputy McGregor. Deputy Vaximinix averred, and he also gave a statement to the Internal Affairs Division that he believed that Samples took an apparent fighting stance, was the words he used. Close to the officer. Close to the officers. Of course, the question is not so much use of any force whatsoever, it's use of excessive force. And the question is whether a reasonable officer would have used some other kind of constraint, such as, obviously, if the man doesn't have a weapon, grabbing him and cuffing him, or pushing him to the ground in some way, rather than using a taser. Well, what a lot of the courts have held, and I'll go back, or this Court, I'll go back to the Ramirez v. Martinez case. This Court may note that that second tasing incident after Ramirez was handcuffed, that was what was unreasonable excessive force. Both in Pratt v. Harris County, Texas, and Galvin v. City of San Antonio, there was an individual causing disturbance that drugs were found in his system as well. And in both of those cases, they used a taser to gain control of that suspect who was causing a disturbance and clearly acting erratic. And in both of those cases, it was not an excessive use of force because they were resisting. And here, we have the fact that Samples actively resisted McGregor's apprehension of him. Mr. Samples failed to obey any lawful command of Deputy McGregor's to stop. Stop walking away. Get in the patrol vehicle. And drugs were found in his system. He was acting in an erratic behavior. So for those reasons, Deputy Vadziminic feels that his conduct in tasing him to gain control of Mr. Samples was reasonable. There was no further contact that Deputy Vadziminic made with Mr. Samples. It was only that one tasing incident. And after that, when he fell to the ground, he fell on his backside. Both deputies testified to that. And McGregor was the one who handcuffed him. No more contact from Deputy Vadziminic. So as you say, he posed an immediate threat to the safety of the officers. Yes, Your Honor. All right. That is what the officers said. Thank you, Ms. Jimenez. Thank you. Thank you, Your Honor. Please accord. Tom McQuaid from Galveston. I think I want to start off with talking about a couple of factual particulars where I have disagreement with Ms. Jimenez. First one is that I think she has described to you Mr. Samples breaking free from Officer McGregor's grasp, which kind of is what happened. I think I'll just call him the defendant because I didn't hear his surname pronounced till today either. But the defendant made the statement, oh, Mr. Samples was exhibiting unusual strength despite his small stature by pulling away from Officer McGregor. And that was kind of bolstering this reasonable fear of injury from Mr. Samples or something. But what Deputy McGregor says is when Mr. Samples pulled away from him, he backed off. The phrase he used is to create distance. And so it's a Deputy McGregor creating kind of this zone of distance between him and Mr. Samples so it doesn't get any worse. It's not Mr. Samples being Herculean and throwing the officer off his body. Or whatever. Now, the other, I think, important factual particular about this, I think there has been an attempt made in the briefing to show a refusal to obey lawful commands. And that, you know, he wasn't being arrested for something exactly. But I want to ask the court to think about, you know, I cited this old case. It was U.S. against Carol Franco. It didn't have anything to do with excessive force. But it had this elegant definition of arrest. That an arrest is an understanding between the officer and the citizen. That citizen better not go anywhere. And that he is subject to the use of force to compel compliance with lawful commands. And so I think the court should consider this proposition. That's this understanding between officer and citizen. If the citizen is exposed to some risk of force, then shouldn't there be some communication from the officer that creates that understanding that you are being commanded to behave in a certain way and there are consequences to disobeying those commands. But wasn't he commanded to stop? I'm not seeing commands, Your Honor. And I think now the defendant says, oh, well, Deputy McGregor was issuing him some commands that he didn't obey. But here's what Deputy McGregor says. And I'll just kind of throw out some page references. The biggest, my favorite one, his affidavit, page 184 of the record. I tried several times to convince Mr. Samples to get in my car. And he says in his internal, not internal audit, internal affairs report, Mr. Deputy McGregor tells him, Mr. Samples, I told him he could call his sister once he got in my car. I tried to get him in the car where it was warm. I tried to tell him to get in there where it was warm and he kept repeating he wanted to call his sister. That's page 136, 149, page 150 of the record. I again asked Mr. Samples to stop and get in my car. He said something about a nearby friend. I offered to take him there and ask him to get in my car. These are like requests and suggestions and cajoling and stuff. I don't think these are lawful commands that create that understanding that Mr. Samples is supposed to have. If I don't do what I'm told, I could get hurt here. And so bearing in mind, now I'm trying to circle back eloquently just kind of the legal structure of all this. I want to suggest to the court, now there's a couple of analytical processes. You might start by telling us what's your closest and best case to show that the law was clearly established that this was a violation. The clearly established law, now this is going to be weird because the plaintiff lost this one, but this court did say in Williams against City of Cleveland, you know, in those taser cases where we have rejected qualified immunity for officers, the person attempting was not attempting to, the person tased was not attempting to flee. And so that's the one I earmarked for under the clearly established law question. If the guy's not running away from you and you tase him, the law is clearly established that there is an exposure to liability. I thought he was trying to get away. He was going in the opposite direction, away from the officers. Now, I think that's other fact issue territory too. I don't remember it seemed like saying he was running away. He got away from Deputy McGregor and the defendant says he then assumed a fighting stance. He wasn't going anywhere. I think he was just standing there. And, you know, musing the court was not really my primary purpose, but I talked about, you know, standing there with his dentures in his fist. And so that was his fighting stance. What about the evidence that indicated he was, whether he was walking or running, I don't know, toward the retention pond? That would have been away from the officers. I'm glad Your Honor mentioned this first. It was two football fields worth of retention pond away with patrol, at least to start out. Deputy McGregor had his patrol car between Mr. Samples and this 600 yards of street that I think, I think straight dead ended into the pond. 600 feet, not 600 yards. 600 feet, I'm sorry, 200 yards, two football fields, not counting end zones. And so, yes, that's a long ways. And besides which, I mean, I think this maybe sounds more like a technical point, but the defendant summary judgment affidavit didn't say I tasered the guy to keep him from going and drowning himself in the retention pond. The affidavit says I did it for fear of my safety. I think where that focuses, oh, and the one case, since Your Honor asked for cases, you know, my very favorite one is... The availability of qualified immunity really turned, frequently turns on whether there are cases or not that inform this particular fact circumstance. It's a very awkward doctrine to apply because there always has to be a first case that establishes this. But nonetheless, this seems like a pretty tough case, but you got to find case law that supports it. And that's the law. All that stuff seems to have a... Now, I could mention this Newman v. Guidry, which is not about a man in his underwear. I can't find another one with a man in his boxer shorts, a 156-pound man in his boxer shorts. But Newman v. Guidry was another one that said... That's my favorite because I think it has my favorite sentence of the jurisprudence on the subject, which is the officer's theory that they were trying to prevent serious injury or death to themselves is severely overwrought, is what the opinion says. So I wanted the opportunity to quote that. What case can you point to that says that there's no qualified immunity to tase a person that is unarmed and is walking away from an officer? I think those... And sometimes the facts of the cases get mixed up in my head, but I think towards the end of my brief, I talked about the case where they mentioned tasers when somebody's not fleeing arrest, that that's a potential 1983 case. You tase somebody who's not fleeing arrest, and that's the Williams case, and it was Harris against Serpis, I think. Well, actually, the plaintiff lost the case because the plaintiff was brandishing a knife at the officer, but they talk about that, and I think that's where they kind of narrowed down and talked about taser cases. And I mentioned that Williams case that says, law is clearly established. You tase somebody that's not fleeing arrest, and then you can be exposed to liability. And I do want to make a... I want to remind the court, we're really talking... We have two analyses going on at the same time. One of them is, where do we put this case on the spectrum or yardstick, something linear, of force cases? Is it one of those where we can tell the officers... And there's a big swath of them where we say, you don't have to expose yourself to a jury because there was an event of an arrest, flight from arrest, or fighting, or whatever, and you were in this zone of proper force. But there's that other swath of cases that say, no, you go zap this 150-pound guy and crack his head open when he hits the street because he's just standing there in what you call the fighting stance. But then one of the officers, one of the other of you, told the EMS people he wasn't being combative. And I know we kind of exchanged some fire in that in our briefs. I know Ms. Jimenez says, oh, well, that's just hearsay. I said, well, no, we've got some hearsay. It's either non-hearsay, if the defendant said it, it's an admission, or statements, excited utterances, and present sense impressions. What do you do with, and how do you compare the facts here with the facts in the Carroll case? Because that was also a tasing case, and the suspect was seated inside a dwelling. Gosh, if I can remember right now, I think, I don't know if that was the Knife case, or if that was the one where there was some exhibit of... He was in his home. Well, he's the guy trying to break into the, break the window to get in the home. The officer had a report of criminal mischief or vandalism. I think maybe part of the downside of talking about how factually intensive these cases are is trying to separate them all mentally. They do all kind of run together. I can't keep them all straight. I'm sorry. Well, the facts that are important, it seems to me, in comparing with the Carroll case are not so much what happened beforehand, or whether it was his home or whatever, but he was seated, and the officers were telling him to get down on the floor, and he refused to do that, and he was tased. So that's at least close enough that we can talk about comparing it to your facts. If we can say this, and I understand there's something between casual, consensual conversation and arrest, and there's investigatory things. Well, not Carroll. The officer knew that he was unarmed, and he weighed about 160 pounds, and so he was not a food counselor. So that's coming. But if we can say, one more little footnote is the other procedural issue is about we are here on a summary judgment, and the question becomes not only where do we put this on the spectrum of cases, but can we put it there? You know, if we're putting a push pin on the ruler, can we put it there as a matter of law? Because a reasonable jury could not disagree with the proposition that Mr. Samples was refusing to carry out lawful commands that he had some duty to obey. And maybe that's the difference between the ones where the plaintiffs lose, the ones where the plaintiffs win, or at least on summary judgments, have to do with. A jury could look at these facts and decide, I don't think he was being commanded. But I understand that. If you read these cases, the qualified immunity doctrine is judicially crafted, and it rests on a profound distrust of juries. They will not trust, properly sensitive to officers' health and safety, and they do not want to, will not subject him. Because the only consequence of denying qualified immunity, he's got to go to a jury. Well, there's an enormous distrust of jury in our law. I don't have to subscribe to it, but it's irrelevant because it's the law. But that's what amounts to it. You know, the truth of the matter is, I've tried a lot of these cases, and the juries are very protective of them. But nonetheless, the law is that you also will not have to take his case to a jury unless you have these, you can identify uncertainty in the law. And that's where we are. But I do think, Your Honor, and maybe this Supreme Court case, Tolan against somebody from a couple of years ago. Tolan versus Cotton. Was to tell us, you may remember Justice Alito expressing how bored he was with participating in that case. But the point of that is that these are still summary judgments. You know, qualified immunity or not, this is a summary judgment case. And the movement has to establish as a matter of law. There's no material fact issues. And a jury can't decide that Mr. Sample shouldn't have been getting tasered because he wasn't being commanded not to do anything. And I think, you know, I mentioned that Newman versus Guidry. That was going on in there where he was saying, well, I wasn't being commanded. And I said something smart aleck about my private parts or something while Mr. Guidry was shaking me down and then got tased over it. And I think the examples there are what that teaches us is this all has to be, you get out of going in front of a jury if you put together enough of a summary judgment record to eliminate material fact issues. But the overlay to that is you may have a genuine material issue of fact, a dispute. However, the question becomes, overlaying that, is whether a reasonable officer under those, under the facts as he, the officer, perceives them, perceives them, there is. And that's, it's not particularly a summary judgment to my eyes. Well, I understand. And I'm with you, Your Honor, on the, on the, this is the officer's perspective of the reasonable, what the reasonable officer. That's a very significant overlay. Now, you know, Your Honor, when, when the court and I were young people, we would read cases about how, you know, what, what is reasonable behavior and what is, what is negligence and what is intent. Those, those were so inherently factual as you couldn't get summary judgments on them. And we've evolved and we don't, you know, we don't look at it that simplistically anymore. But the law used to be that. And maybe there was some reason why the law was that. Do you have a case that says that the officer would be required to try to physically restrain someone like Mr. Samples before tasing him? Um, Your Honor, I'm thinking about, there was, there was one that talked about a gap. What created liability was a gap between kind of a low-key exchange and the exercise of force. I don't know which one it is. I don't want to be flipping pages too much, using up too much of my 20 minutes to that. I have cited, I have cited the court a case right there at the end of the brief. Maybe it was Michelle against somebody or something like that where, where the, there needs to be a proportional escalation of the relationship between the officer and the citizen. And again, that's part of that, before you get to the arrest understanding and you can shoot the guy, you know, if you want to, if he's running away from you or something like that, that there, there needs to be some sort of process to get from not using force on somebody to, to being entitled to tase him. And so I think, and I think that's, you know, that's, that's where we are. I keep pounding since it's a summary judgment. Of course, I want to say fact issued like 20 times today. And part of that is, okay, how do we know as a matter of law was he refusing lawful commands? And I'm saying, well, no, it doesn't. If you read the language of what Deputy McGregor was, was telling him, they don't sound like commands. They sound like suggestions. It doesn't sound like Deputy McGregor was really interested in arresting Mr. Samples for anything. So summarize for us what you say the fact issues are. I'm not talking about ultimate conclusion, but facts in terms of who did what to whom on the scene. What, what, what are the disputes that are, that are material? In an ultimate fact issue of reason, was it reasonable to use? I'm not talking about that kind. I'm talking about raw, raw historical, what we call raw historical fact. Was there some command given to Mr. Samples by Deputy McGregor that Deputy, that Mr. Samples was obligated to obey because he was getting arrested or some, there was some sort of investigative thing going on that entitled Deputy McGregor to tell Mr. Samples, go get in my car. And that exposed him to being tased if he didn't get in the car. The other thing is, the fact issue is this interplay between them telling the EMS people, no, he was not combative. He just wanted to call his sister. But sure sounds like Deputy McGregor talking, as opposed to he adopted a fighting stance, which kind of implies he was going to fight somebody or take a swing at somebody with those dentures or whatever was going to happen, that there was some potential potential for combat that might ensue that was, that tasering him was putting a stop to. And if the answer is, well, remember, I want to say summary judgment again. In fact, issue a few more times this statement to the EMS people, no, he wasn't being combative. He just wanted to, this crazy guy just wanted to keep calling his sister. All right. Therefore, I thank the court and ask for affirmance of the judgment. Thank you, Mr. McQuaid. Ms. Jimenez, you've saved time for rebuttal. Judge Clement, you asked about whether he had a case. Should, does the officer have the right to physically restrain someone like Samples? There is a case and it's called Stanley v. City of Baytown versus Stanley v. City of Baytown, Texas. Out of the Southern District of Texas, Houston Division. And what that case is, it's about the community caretaking function. So law enforcement officers, not at note five, law enforcement officers not only investigate crimes, but also perform community caretaking functions, which are totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. Community caretaking functions include stopping or seizing a citizen for his own safety and or the safety of others, regardless of the officer's suspicion of criminal activity or lack thereof. So these officers, even if they didn't have probable cause to make a arrest for some, like he was breaking into somewhere, under the community caretaking function, these officers had a right to seize him and put him in the patrol vehicle. But we also have case law that says that the possibility of a serious crime or a serious incident or harm, it kind of escalates in terms of what kind of force can be used. I mean, here the taser is at the more extreme end of the kind of force that was used, but there is kind of a sliding scale in terms of what the person is up to. Yes, Your Honor. And that even fits within the community caretaking. That doesn't fit with it. Well, in this case, he actually went into the ambulance and tased the man who was having seizures and he had to protect the man himself to let EMS help the man because he started, I think, flailing around and he was injuring the EMS. So the officer actually climbed into the ambulance and tased him so that he would stop hurting the EMS and let them give treatment to them. And this court said that's part of that community caretaking function. But you are right, Your Honor. These situations, they get so volatile and tense so quick. Well, the officers did attempt essentially to invoke that caretaker function, but with a suggestion that he was walking toward a pond they might get to. Difficulty with that factually is that it's so far away. That the retention pond? Well, we don't know at what point Deputy McGregor said it was 600 feet away. We don't know if he continued to walk and how far he was, how far he got, how close he got to the retention pond. At one point, Deputy McGregor moves his car closer to the retention pond to try to block samples from going to the retention pond. So we don't know at what point they were. Was that the very first point that they came upon him, that that retention pond was 600 feet away? We have no evidence of that, Your Honor. All right. Thank you, Ms. Jimenez. Your case is under submission. Last case for today, Garcia v. Walmart.